# UNITED STATES DISTRICT COURT

### for the

Eastern District of California

FILED

MAY 0 9 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| 973 Green Ridge Drive, | ) | Case No. 2:18-SW-422 AC |
| Stockton, California, 95209 | ) | |
| | ) | |

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

SEE ATTACHMENT A-2, attached hereto and incorporated by reference.

located in the _____ Eastern _____ District of _____ California _____, there is now concealed (*identify the person or describe the property to be seized*):

SEE ATTACHMENT B-2, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is (*check one or more*):

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiring to commit a federal offense |
| 18 U.S.C. § 922(a)(1)(A) | Dealing firearms without a license |
| 26 U.S.C. § 5861(d) | Possessing an unregistered firearm |
| 18 U.S.C. § 922(g)(1) | Being a felon in possession of a firearm |

The application is based on these facts:

**SEE AFFIDAVIT, attached and incorporated by reference.**

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Austin Kern, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/8/18

_____
*Judge's signature*

City and state: Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF ATF SPECIAL AGENT AUSTIN KERN IN SUPPORT OF A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Austin Kern, being duly sworn, do hereby declare and state the following:

## BACKGROUND & EXPERTISE

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since January 2015. I have completed twenty-six weeks of training, including the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, at the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the San Francisco Field Division in the Stockton Field Office. As part of my duties, I investigate criminal violations relating to firearms, explosives, arson, violent crime, criminal street gangs, and narcotics. I have participated in and spoken to law enforcement officers who have participated in all aspects of criminal investigations, including, but not limited to, interviews, physical surveillance, the execution of search warrants, and the arrest of criminals. I have participated in conventional investigative methods, including, but not limited to, electronic surveillance, visual surveillance, the use of GPS/E-911 data, questioning of witnesses, search warrants, confidential informants, pen registers, and trap and trace. Through my training, experience, and conversations with other law enforcement officers, I am familiar with the identification of various controlled substances as well as identifying firearms relating to violations of Titles 18 and 26. I am familiar with various criminal activities and methods used to obtain, possess, transport, and/or sell controlled substances and firearms in violation of federal law. These methods include using public telephones, wireless cellular communication technology, and counter surveillance. They also include elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and the use of coded or vague communications. Often, these are attempts to avoid detection by law enforcement and to circumvent narcotics investigations.

1

2.       The facts and information set forth in this affidavit are based upon my training, experience, personal knowledge, and relevant information provided to me by other agents, documents, and records. Because I submit this Affidavit for the limited purpose of setting forth probable cause for the requested search warrants, arrest warrants, and criminal complaint, I have not included every fact known to me concerning this investigation. I have only included what I believe are adequate facts to establish probable cause that the named defendants have violated the United States Code and that evidence of these violations will be found in the locations to be searched. However, I have not intentionally omitted any fact material to this Court's determination of probable cause to search the locations identified in Attachments A-1 through A-4.

3.       In addition, where I describe statements made by other people – including other special agents and law enforcement officers, the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is also described in sum, substance, and relevant part.

## SCOPE OF REQUESTED CRIMINAL COMPLAINT

4.       This Affidavit is submitted in support of a Criminal Complaint charging Christian OROZCO, MICHAEL SANCHEZ, MAXIMILIANO SANCHEZ, and Michael BENNETT with:

COUNT ONE: 18 U.S.C. § 371 – ALL DEFENDANTS

Between about January 11, 2018, and the present, the defendants knowingly conspired to violate 18 U.S.C. § 922(a)(1)(A), dealing firearms without a license, a violation of 18 U.S.C. § 371.

COUNT TWO: 18 U.S.C. § 922(a)(1)(A) – Christian OROZCO

Between about January 11, 2018, and the present, the defendant knowingly dealt firearms

2

without a license, a violation of 18 U.S.C. § 922(a)(1)(A).

COUNTS THREE THROUGH SIXTEEN: 26 U.S.C. § 5861(d) – Christian OROZCO

On or about the dates listed below, the defendant knowingly possessed a firearm not registered to him in the National Firearms Registration and Transfer Record, a violation of 26 U.S.C. § 5861(d).

| Count | Date | Firearm |
|-------|------|---------|
| 3 | 02/02/18 | Short-barreled AR-style rifle with no identifying markings |
| 4 | 02/02/18 | Mossberg 12-gauge short-barreled shotgun, model 600 AT, bearing serial # #H716838 |
| 5 | 02/07/18 | Romarm Cugir 7.62-caliber machinegun pistol, model WASR 10-63, bearing serial # 1979ZRE4460 |
| 6 | 02/07/18 | Remington 12-gauge short-barreled shotgun, model 11-87, bearing serial #PC355470 |
| 7 | 02/27/18 | Westernfield 12-gauge short-barreled shotgun, model M550 ABD, bearing serial #H175163 |
| 8 | 02/27/18 | Maverick Arms 12-gauge short-barreled shotgun, model 88, bearing serial #MV5475H |
| 9 | 03/07/18 | AR machinegun rifle with no identifying markings |
| 10 | 03/07/18 | AR machinegun pistol with no identifying markings |
| 11 | 03/07/18 | Taurus 20-gauge short-barreled shotgun, model S20-223, bearing serial #SR387082 |
| 12 | 03/15/18 | Mossberg 12-gauge short-barreled shotgun, model 600 AT, bearing serial #H454835 |
| 13 | 03/28/18 | Glock model 22 .40-caliber machinegun pistol made from an unfinished receiver and a barrel displaying serial #MDY453 |

| 14 | 04/16/18 | Glock .45-caliber machinegun pistol, model 30, with an obliterated serial # |
| 15 | 04/16/18 | Glock .45-caliber machinegun pistol, model 21, bearing serial #AZL229 US |
| 16 | 04/16/18 | Glock .40-caliber machinegun pistol, model 22 made from an unfinished receiver with no serial # |

COUNTS SEVENTEEN THROUGH TWENTY-FOUR: 18 U.S.C. § 922(g)(1) –

Christian OROZCO

On or about the dates listed below, the defendant – having previously been convicted of a crime punishable by more than one year in prison – possessed a firearm, a violation of 18 U.S.C. § 922(g)(1).

| Count | Date | Firearms and/or Ammunition |
|-------|------|----------------------------|
| 17 | 01/11/18 | Springfield Armory .45-caliber pistol, model XDS, bearing serial #XS511646<br>Ruger 9mm pistol, model SR9C, bearing serial #334-24052 |
| 18 | 01/24/18 | Ruger 5.56-caliber rifle, model AR-5556, bearing an obliterated serial # |
| 19 | 02/21/18 | Stoeger 12-gauge shotgun, model P350, bearing serial #910845 |
| 20 | 02/27/18 | Smith & Wesson .223/5.56-caliber rifle, model M&P 15, bearing serial # TF11196<br>Westernfield 12-gauge shotgun, model M550 ABD, bearing serial #H108692 |
| 21 | 03/15/18 | Daniel Defense 5.56-caliber rifle, model M4, bearing serial # DDM4059879<br>Sig Sauer 5.56-caliber rifle, model SIG M400, bearing serial #20C074691 |
| 22 | 03/28/18 | DPMS, Inc. multi-caliber rfile, model A-15, bearing serial #DNWC037202 |
| 23 | 04/16/18 | Glock.40-caliber pistol, model 22, bearing serial #VCA062<br>Glock 9mm pistol, model 19, bearing serial #ATK871 US |
| 24 | 05/03/18 | Mossberg 12-gauge shotgun, model 500 ATP8, bearing serial # H386124 |

4

## SCOPE OF REQUESTED SEARCH WARRANTS

5.     This affidavit also is submitted in support of warrants to search the following locations:

a.  The residence located at 8755 Deer Creek Circle, Stockton, California and described in more detail in Attachment A-1;

b.  The residence located at 973 Green Ridge Drive, Stockton, California and described in more detail in Attachment A-2;

c.  The apartment located at 4030 E. Morada Lane #2206, Stockton, California and described in more detail in Attachment A-3

d.  The Chevrolet Monte Carlo driven by Christian Orozco and described in more detail in Attachment A-4.

## BACKGROUND OF THE INVESTIGATION

6.     ATF agents received information from a confidential informant (CI) that an individual was trafficking firearms in the Stockton and Lodi areas, which are located within the Eastern District of California. The CI has a misdemeanor criminal record and is working with agents for financial compensation.

7.     Agents subsequently identified the suspected gun trafficker as Christian Carlos OROZCO, also known as "Gambo." They searched his criminal history and determined that he had previously suffered a felony conviction.

8.     ATF agents surreptitiously recorded the transactions described below with video and/or audio equipment. In addition, surveillance teams monitored the transactions via wire transmission.

### January 11, 2018: Purchase of three firearms at 8755 Deer Creek Circle

9.     On January 11, 2018, at about 12:16 p.m., an ATF undercover agent (UC1) and

5

the CI arrived in front of the residence at 8755 Deer Creek Circle in Stockton, California. The CI and UC1 traveled to this location to meet with OROZCO and conduct a firearm transaction. In the presence of UC1, the CI called OROZCO at (209) 420-4511.[1] OROZCO answered and said that he was down the street at his cousin's house but would be back shortly.

10.     At about 12:45 p.m., OROZCO and an unidentified Hispanic woman arrived at the residence in a black Pontiac. UC1 and CI followed OROZCO as he entered the garage of the house. UC1 saw OROZCO place three firearms on top of a white Cadillac parked inside the garage. The CI asked OROZCO how much he wanted for all three firearms. OROZCO replied that he wanted $650.00, $850.00, and $850.00, for a total of $2,350.00. The CI provided OROZCO with $850.00 in pre-recorded U.S. currency for one of the firearms. UC1 began to count out and pay OROZCO the additional $1,500.00 in pre-recorded U.S. currency as payment for the other two firearms. As he did so, a man previously identified as MICHAEL SANCHEZ[2] came from the house into the garage and asked, "You cashing out right now?" MICHAEL SANCHEZ then told someone on the phone, "They're all gone right now. The dude just cashed out."

11.     During the transaction, the CI told Orozco that UC1 was a firearms buyer. UC1 asked OROZCO if he came across firearms very often, and OROZCO replied, "Yeah, all the time. I have hella guns." UC1 asked OROZCO if he could acquire AR and AK rifles. OROZCO proceeded to show UC1 an image of an AR rifle on his cell phone and claimed that he had just sold it. OROZCO further said that the prices for the AR's are about $1,200.00 to $1,300.00 and that they are brand new. The CI asked OROZCO if it would be alright if the CI gave OROZCO's telephone number to UC1. OROZCO affirmed. At about 12:57 p.m., the CI and UC1 left the

---

[1] A May 2, 2018, database query showed that a person named "Orozco Christia" subscribed to this number.

[2] On January 4, 2018, another ATF agent had seen a man in the garage of 8755 Deer Creek Circle. The agent had also seen this man get out of a Cadillac bearing California license plate number 775LNQ. The car was registered to MICHAEL SANCHEZ. The agent confirmed that the man was MICHAEL SANCHEZ by reviewing his California driver's license photo.

6

location.

12.     Agents transported the firearms to the Stockton ATF Field Office for processing. The firearms were identified as one Springfield Armory .45-caliber pistol, model XDS, bearing serial #XS511646; one Ruger 9mm pistol, model SR9C, bearing serial #334-24052; and one Glock 9mm pistol made from an unfinished receiver with no serial number. OROZCO also provided UC1 and the CI with two extended magazines that carried about 31 rounds each, 55 rounds of 9mm ammunition, and seven rounds of .45-caliber ammunition.

### January 24, 2018: Purchase of one firearm at 1356 Bass Pro Drive

13.     On January 24, 2018, at about 2:19 p.m., two ATF undercover agents – UC1 and UC2 – arrived in the parking lot of the Bass Pro Shop located at 1356 Bass Pro Drive in Manteca, California, to meet with OROZCO. UC1 had previously arranged to conduct a firearm transaction with OROZCO at this location. UC1 had made these arrangements by communicating with OROZCO at (209) 420-4511. In text messages sent from this number, OROZCO advertised the firearm as a "brand new" AR "with armor piercing rounds." OROZCO had also sent a photograph of the gun.

14.     At about 3:03 p.m., OROZCO called UC1 from (209) 420-4511 to advise that he was in the area in a silver Honda Civic. Shortly after, UC1 saw a silver Honda Civic with dealer license plates park next to the undercover vehicle. UC1 saw OROZCO in the front passenger seat and a man later identified as MAXIMILIANO SANCHEZ[3] in the driver's seat. UC1 got out of the undercover vehicle and greeted OROZCO outside of the Honda. MAXIMILIANO SANCHEZ released the Honda's trunk lock. UC1 followed OROZCO to the open trunk and saw an AR-15-style rifle wrapped in a black sweatshirt. OROZCO removed the AR-15 from the

---

[3] MAXIMILIANO SANCHEZ introduced himself to UC1 as "Max" on February 27, 2018. Analysis of pen register data and the CLEAR database indicated that that he might be MAXIMILIANO SANCHEZ. UC1 confirmed this identity by reviewing MAXIMILIANO SANCHEZ's California driver's license photograph.

trunk and placed it in the backseat of the undercover vehicle. UC1 handed OROZCO $1,270.00 in pre-recorded U.S. currency to complete the transaction. UC1 and OROZCO talked about other firearms transactions while OROZCO showed UC1 pictures of firearms on his cell phone. At about 3:08 p.m., the UCs left the location.

15.     Agents transported the AR-15-style rifle to the Stockton ATF Field Office for processing. The firearm was identified as a Ruger 5.56-caliber rifle, model AR-556, with an obliterated serial number. The rifle was loaded with a magazine containing seven rounds of 5.56-caliber ammunition.

### February 2, 2018: Purchase of two firearms at 8755 Deer Creek Circle

16.     On February 2, 2018, at about 10:34 a.m., UC1 and UC2 arrived at 8755 Deer Creek Circle in Stockton, California, to meet with OROZCO for another firearm transaction. UC1 had arranged this transaction by communicating with OROZCO at (209) 420-4511. As OROZCO and UC1 discussed logistics in text messages sent in advance of the transaction, UC1 told OROZCO, "I'm about 3 hours away from you. That's why I try and schedule a couple buys in the area." OROZCO replied, "Forsure, bro." OROZCO added that he would hold a weapon for UC1 until Friday or potentially deliver it to UC1.

17.     MICHAEL SANCHEZ met the agents at the front door of the house on February 2, 2018. The UC's entered the residence, greeted OROZCO, and followed him to the kitchen area, where they saw an AR-style rifle and a shotgun on the kitchen table. UC1 noted that the shotgun barrel seemed short. OROZCO picked up the shotgun and acknowledged that it was "hella short." He said that he had been planning to put a pistol grip on it. UC1 and OROZCO agreed on a price of $2,000.00 for both firearms.

18.     As the UC's were talking with OROZCO about the prices for the two firearms, UC1 asked OROZCO about automatic Glock pistols. OROZCO said that he was trying to get some and that a friend makes them. He added that these guns are regular Glocks with a switch.

8

OROZCO said that he usually obtains a Glock for $700 and that, after his friend makes it automatic, he re-sells the Glock for $1,600. OROZCO told UC1 that he would sell to UC1 for a bit less. OROZCO then showed the UC's a video on his cell phone of his friend shooting a machinegun in the air. UC1 asked OROZCO if he had access to automatic AR-15 rifles. OROZCO replied that his friend has the metal plates that make an AR-15 automatic.

19.     At about 10:45 a.m., UC1 handed OROZCO $2,000.00 in pre-recorded U.S. currency. At about 10:54 a.m., the UC's left the location. Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one short-barreled AR-style rifle with no identifying markings and one Mossberg short-barreled 12-gauge shotgun, model 600 AT, bearing serial number #H716838. OROZCO also provided the UC's with 27 rounds of .223-caliber ammunition and four rounds of 12-gauge shotgun ammunition.

20.     ATF's Firearms Technology Criminal Branch later examined the AR-style rifle. The branch report issued on March 15, 2018, confirms that the rifle's barrel is shorter than 16 inches and, thus, that it is a firearm under 26 U.S.C. § 5845(a)(3). The branch report also confirms that the rifle contains no identifying markings as required by 26 U.S.C. § 5842.

21.     ATF's Firearms Technology Criminal Branch also examined the Mossberg shotgun. The branch report issued on March 30, 2018, confirms that the shotgun's barrel is shorter than 18 inches and, thus, that it is a firearm under 26 U.S.C. § 5845(a)(1). The branch report also confirms that the shotgun contains no identifying markings as required by 26 U.S.C. § 5842.

**February 7, 2018: Purchase of three firearms at 8755 Deer Creek Circle**

22.     On February 7, 2018, at about 4:19 p.m., UC1 arrived at 8755 Deer Creek Circle in Stockton to meet with OROZCO to purchase firearms. UC1 and OROZCO had arranged this meeting via the (209) 420-4511 number.

23.     UC1 got out of the undercover vehicle and greeted OROZCO at the front door.

9

UC1 entered the house and followed OROZCO to the kitchen area. UC1 saw MICHAEL SANCHEZ and an unidentified Hispanic woman sitting at a kitchen table. UC1 saw an AK-47-type firearm on the kitchen table. S/he also saw an AR pistol and a short-barreled shotgun on the kitchen island. While OROZCO and UC1 were discussing the prices and features of the firearms, MAXIMILIANO SANCHEZ entered the home through the interior garage door. OROZCO then advised UC1 that the person who provided the AR pistol is making them from unfinished receivers.

24.     UC1 and OROZCO agreed on a price of $3,700.00 for all three firearms. UC1 paid OROZCO $3,000.00 in pre-recorded U.S. currency. UC1 explained that the rest of the money was in the undercover vehicle. UC1 and MICHAEL SANCHEZ carried the firearms to the undercover vehicle. UC1 then provided Orozco with his balance payment of $700.00 in pre-recorded U.S. currency. OROZCO told UC1 that, when he came back, OROZCO would have the Glock machinegun and a double-barreled shotgun. As UC1 began to leave the house, UC1 noticed OROZCO waving him down. OROZCO then provided UC1 with two boxes of .223-caliber ammunition. At about 4:36 p.m., UC1 left the location.

25.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one AR-style pistol with no identifying markings; one Romarm Cugir 7.62-caliber pistol, model WASR 10-63, unknown serial number; and one Remington short-barreled 12-gauge shotgun, model 11-87, bearing serial #PC355470.

26.     ATF's Firearms Technology Criminal Branch later examined the Romarm Cugir pistol. The branch report issued on March 15, 2018, confirms that a single function of this pistol's trigger automatically shoots more than one shot without manual reloading. Thus, the weapon is a machinegun under 26 U.S.C. § 5845(b). The branch also located a serial number of 1979ZRE4460.

27.     ATF's Firearms Technology Criminal Branch also later examined the Remington shotgun. The branch report issued on March 30, 2018, confirms that the shotgun's barrel is

10

shorter than 18 inches and, thus, that it is a firearm under 26 U.S.C. § 5845(a)(1). The branch report also confirms that the shotgun contains no identifying markings as required by 26 U.S.C. § 5842.

### February 21, 2018: Purchase of two firearms at 8755 Deer Creek Circle

28.     On February 21, 2018, at about 1:04 p.m., UC1 and UC2 arrived at 8755 Deer Creek Circle in Stockton, California, to meet with OROZCO to conduct a firearm transaction. UC1 had communicated with OROZCO via the (209) 420-4511 number to arrange for this transaction.

29.     At about 1:12 p.m., the UC's saw a black Honda Accord with paper dealer plates arrive at the house and park next to the undercover vehicle. The UC's saw a man later identified as Shabaz Ahsan KHAN get out of the driver's seat. OROZCO got out of the rear driver's seat. A third man sat in the front passenger seat. OROZCO greeted the UC's as KHAN retrieved a gray and white blanket from the trunk of the black Honda. OROZCO opened the garage door, and KHAN placed the blanket on the hood of a white Cadillac. OROZCO took the blanket and its contents and entered the house through a door in the garage. The UC's and KHAN followed OROZCO into the house.

30.     There, the UC's saw a shotgun and several rounds of 12-gauge ammunition on the kitchen table. OROZCO then uncovered an AR-style pistol from within the gray and white blanket. UC1 inspected the firearms and placed $2,000.00 in pre-recorded U.S. currency on the table in front of OROZCO.

31.     The UC's and OROZCO then engaged in conversation. OROZCO told the UC's that he and his cousin were going to travel to Oregon in the near future to acquire firearms. OROZCO then showed the UC's a video on his cellular phone of firearms allegedly from Oregon. KHAN then asked one of the UC's what they were looking for. OROZCO replied "a fully," meaning a fully-automatic gun. KHAN advised that he could check on a Glock and an

11

AR. OROZCO told the UC's that he could acquire "switches" for Glocks and AR-15s. Switches are devices that convert firearms to function as machine guns. At about 1:20 p.m., the UC's left the residence.

32.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one Stoeger 12-gauge shotgun, model P350, bearing serial #910845, and one AR-15-style pistol with no identifying markings. The AR-15-style pistol also came with a loaded, extended magazine containing 16 rounds of 2.23-caliber ammunition. OROZCO also provided the UC's with 12 rounds of 12-gauge shotgun shells.

### February 27, 2018: Purchase of four firearms at 8755 Deer Creek Circle

33.     On February 27, 2018, at about 3:15 p.m., UC1 arrived at 8755 Deer Creek Circle in Stockton, California, to buy a firearm from OROZCO. UC1 had communicated with OROZCO at (209) 420-4511 to arrange for this transaction.

34.     Upon arrival, UC1 saw OROZCO and MAXIMILIANO SANCHEZ standing in the garage. UC1 followed OROZCO through the garage and into the house. Upon entering the kitchen area, UC1 saw two short-barreled shotguns, another shotgun, and an AR-15-style rifle on the kitchen table. UC1 and OROZCO started discussing one of the short-barreled shotguns. During this conversation, OROZCO explained, "That's why they give you such a fucking crazy-ass charge. 'Cause if you cut 'em, that's a damn near almost a handgun."

35.     UC1 placed $3,400.00 in pre-recorded U.S. currency on the table next to OROZCO. UC1 and OROZCO walked out of the house. OROZCO carried the firearms, which were wrapped up in a bed sheet provided by MAXIMILIANO SANCHEZ, and placed them in the rear floorboard of the undercover vehicle. UC1 then left the area.

36.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one Smith & Wesson .223/5.56-caliber rifle, model M&P 15, bearing serial #TF11196; one Westernfield 12-gauge shotgun, model M550 ABD, bearing serial

12

#H108692; one Westernfield 12-gauge short-barreled shotgun, model M550 ABD, bearing serial #H175163; and one Maverick Arms 12-gauge short-barreled shotgun, model 88, bearing serial # MV5475H. The Smith & Wesson rifle also came with an extended magazine loaded with 19 rounds of 5.56-caliber ammunition.

37.     ATF's Firearms Technology Criminal Branch later examined both the Westernfield and Maverick Arms weapons. The branch report issued on March 30, 2018, confirms the Westernfield weapon is made from a shotgun and that its barrel is shorter than 18 inches. Thus, it is a firearm under 26 U.S.C. § 5845(a)(2). The report also confirms that the Maverick Arms weapon is a shotgun, has a barrel shorter than 18 inches and, thus, is a firearm under 26 U.S.C. § 5845(a)(1). The branch report also confirms that neither weapon contains the identifying markings required by 26 U.S.C. § 5842.

## March 7, 2018: Purchase of three firearms at 8755 Deer Creek Circle

38.     On March 7, 2018, at about 12:25 p.m., an ATF task force officer acting in an undercover capacity (UC3) arrived at 8755 Deer Creek Circle in Stockton, California, to buy firearms from OROZCO. UC1 had communicated with OROZCO at (209) 420-4511 to arrange for this transaction.

39.     Upon arrival, UC3 saw OROZCO standing in the garage. UC3 got out of the undercover vehicle and greeted OROZCO in the driveway. UC3 followed OROZCO into the garage. UC3 saw OROZCO retrieve an AR-15-style rifle from the interior of an orange Chevrolet Monte Carlo. OROZCO placed the AR-15-style rifle on the hood of another vehicle parked inside of the garage. UC3 asked OROZCO if the rifle was a "fully," meaning a fully-automatic gun. OROZCO replied, "Yeah, that one's a fully." OROZCO then retrieved another firearm from a bag that was in front of the vehicle and said, "Both of them are."

40.     OROZCO then placed one of the rifles and a shotgun on the hood of the car parked in the garage. UC3 asked OROZCO if the price was $3,900.00 for the rifles and $600.00

13

for the shotgun, to which OROZCO replied, "Yeah." UC3 then handed OROZCO $4,500.00 in pre-recorded U.S. currency. UC3 the left the location.

41.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one AR machinegun rifle with no identifying markings; one AR machinegun pistol with no identifying markings; and one Taurus 20-gauge short-barreled shotgun, model S20-223, bearing serial #SR387082. OROZCO also provided UC1 with 55 rounds of .223-caliber ammunition.

42.     ATF's Firearms Technology Criminal Branch later examined both the AR machinegun rifle and the AR machinegun pistol. The branch report issued on March 15, 2018, confirms that a single function of each trigger automatically shot more than one shot without manual reloading. Thus, each of the weapons is a machinegun under 26 U.S.C. § 5845(b). The branch report also confirms that neither weapon contains identifying markings as required by 26 U.S.C. § 5842.

43.     ATF's Firearms Technology Criminal Branch also later examined the Taurus shotgun. The branch report issued on March 30, 2018, confirms that the shotgun's barrel is shorter than 18 inches and, thus, that it is a firearm under 26 U.S.C. § 5845(a)(1). The branch report also confirms that the shotgun contains no identifying markings as required by 26 U.S.C. § 5842.

### March 15, 2018: Purchase of three firearms at 8755 Deer Creek Circle

44.     On March 15, 2018, at about 12:56 p.m., UC1 and UC2 arrived at 8755 Deer Creek Circle in Stockton, California, to meet with OROZCO to conduct a firearm transaction. UC1 had communicated with OROZCO at (209) 420-4511 to arrange for this transaction.

45.     Upon arrival, the UC's knocked on the front door, where MAXIMILIANO SANCHEZ greeted the UC's and advised that he needed to put his dog away. OROZCO opened the front door a short time later and invited the UC's into the house. The UC's followed

14

OROZCO into the garage, where they saw three firearms displayed on the hood of a vehicle. The UC's saw an electric saw and the barrel of a shotgun on a box inside of the garage.

46.     As one of the UC's inspected the firearms, OROZCO asked MAXIMILIANO SANCHEZ to retrieve the boxes for the firearms. OROZCO then called MAZIMILIANO SANCHEZ and asked him to find the price tag for the Sig Sauer AR-15; he advised that it should be either in the closet or under the bed in MICHAEL SANCHEZ's room. OROZCO showed the UC's a hole in the ceiling of the garage and advised that his friend had accidentally discharged a firearm in the house. OROZCO said this was the second time a firearm had been discharged in the house. UC1 placed $3,500.00 in pre-recorded U.S. currency on the hood of a car next to OROZCO. OROZCO opened the garage door and the UC's left the location.

47.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one Daniel Defense 5.56-caliber rifle, model M4, bearing serial #DDM4059879; one Sig Sauer 5.56-caliber rifle, model SIG M400, bearing serial # 20C074691; and one Mossberg 12-gauge short-barreled shotgun, model 600 AT, bearing serial #H454835. OROZCO also provided the UC's with seven rounds of 2.23-caliber ammunition and one round of 12-gauge shotgun ammunition.

48.     ATF's Firearms Technology Criminal Branch later examined the Mossberg shotgun. The branch report issued on March 30, 2018, confirms that the shotgun's barrel is shorter than 18 inches and, thus, that it is a firearm under 26 U.S.C. § 5845(a)(1). The branch report also confirms that the shotgun contains no identifying markings as required by 26 U.S.C. § 5842.

### March 28, 2018: Purchase of three firearms at 973 Green Ridge Drive

49.     On March 28, 2018, at about 2:48 p.m., UC1 and UC2 arrived at 973 Green Ridge Drive in Stockton, California, to meet with OROZCO to conduct a firearms transaction. UC1 had communicated with OROZCO at (209) 420-4511 to arrange for this transaction. For example,

15

OROZCO had texted the address of "959 Green Ridge Drive" as his new address and requested that UC1 meet him there.

50.     The UC's drove to the area of 959 Green Ridge Drive but saw OROZCO and a man later identified as Michael Stanley BENNETT[4] standing in the driveway of 973 Green Ridge Drive. The UC's got out of the undercover vehicle and greeted OROZCO and BENNETT. The UC's then followed OROZCO and BENNETT into the front room of the 973 Green Ridge Drive. OROZCO led the UC's to a box at the rear of the room. There, they saw a Glock model 22 pistol made from an unfinished receiver; an AR-15-style rifle; and a short-barreled shotgun. The UC's saw that the Glock model 22 pistol was modified with a switch that would make the firearm function as a machinegun. As one of the UC's inspected the Glock pistol, OROZCO said, "It's a fully, and it's a regular," meaning the gun could operate either as an automatic or a semiautomatic weapon.

51.     The UC's spoke with OROZCO about acquiring more Glock machineguns. OROZCO said that he would have more in about three days. BENNETT then asked the UC's how many Glock machineguns they wanted. BENNETT then retrieved a Daniel Defense AR-15 rifle similar to a rifle purchased by the UC's from OROZCO on March 15, 2018. One of the UC's asked BENNETT if the rifle they had purchased was his. BENNETT confirmed, and said, "I wanted to keep it." BENNETT then asked the UC's how many Glock machineguns were they willing to purchase at once. One of the UC's said five at a time. BENNETT then said that he knows an individual who has access to anything. "I can take a flight and fucking pick up thirty of these in a day and fly right back," BENNETT added. One of the UC's placed $3,800.00 in pre-recorded U.S. currency on a box next to OROZCO and asked if the neighbors would be

_____

[4] Michael BENNETT introduced himself to UC1 as "Mike." On March 28, 2018, agents also saw two cars parked in the driveway at 959 Green Ridge Drive: one red Dodge Durango bearing California license plate #7PAV804 and one white Lexus sedan bearing California license plate #7TSK076. California DMV records indicated these cars were registered to Michael Stanley BENNETT and to Rafael Bennett, respectively. UC1 confirmed BENNETT's identity by reviewing his California driver's license photograph.

16

suspicious of the UC's carrying the firearms out of the house. BENNETT then grabbed a rifle box and said, "That's actually the box for the Daniel Defense, the one you got." The box concealed the guns as the agents left at about 3:18 p.m.

52.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as one DPMS Inc. multi-caliber rifle, model A15, bearing serial #DNWC037202; one Remington short-barreled 12-gauge shotgun, model 870 TB, bearing serial #1107038V; and one Glock model 22 .40-caliber machinegun pistol made from an unfinished receiver and a barrel displaying serial #MDY453. This last firearm also included a high-capacity magazine that could carry 29 or 30 rounds. Finally, OROZCO and BENNETT provided the UC's with three rounds of 12-gauge shotgun shells.

53.     ATF's Firearms Technology Criminal Branch later examined the .40-caliber Glock pistol with serial number MDY453. The branch report issued on April 27, 2018, confirms that a single function of this pistol's trigger automatically shoots more than one shot without manual reloading. Thus, the weapon is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). In addition, the report finds that the pistol contains a switch designed to convert a semiautomatic Glock pistol into a machinegun and that this switch, in and of itself, is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). The branch report further confirms that the switch does not bear any markings or identification as required by 26 U.S.C. § 5842.

54.     The short-barreled Remington shotgun has not yet been sent to the branch for analysis.

### April 16, 2018: Purchase of six firearms at 4030 E. Morada Lane

55.     On April 16, 2018, at about 2:52 p.m., UC1 and UC2 arrived near East Morada Lane and Highway 99 in Stockton, California, to buy firearms from OROZCO. UC1 had communicated with OROZCO at (209) 420-4511 to arrange for this transaction. OROZCO

advised UC1 to contact him when he arrived at this location. At about 2:54 p.m., UC1 sent a text message to the (209) 420-4511 and said that he was near the Raley's at the intersection of East Morada Lane and Highway 99. OROZCO asked UC1 to drive to the apartments directly across the street from the Raley's and said he would let UC1 into the gated complex.

56.     The UC's traveled across the street to the Palms at Morada apartment complex located at 4030 E. Morada Lane. They saw OROZCO and an unidentified black man standing by a gate to the complex. OROZCO told the UC's to drive around to the first building to the left and said that they would see his orange Monte Carlo parked near building 2. The UC's parked near building 2 and greeted OROZCO and the unidentified subject at the base of a staircase. The UC's followed OROZCO and the unidentified subject into apartment #2206. Upon entering the apartment, the UC's saw six firearms displayed on the kitchen counter. The unidentified black man introduced himself to the UC's as "Bubba." OROZCO indicated that three of the Glock pistols had been converted to machineguns. As UC1 discussed the prices for the firearms, OROZCO advised that Michael BENNETT supplied the Glock machineguns. OROZCO further advised the UC's that the two additional Glock pistols belonged to OROZCO and that the revolver belonged to MAXIMILIANO SANCHEZ. OROZCO said that his cousin was leaving for Oregon on April 17 to acquire more firearms.

57.     At about 3:08 p.m., UC1 handed $7,800.00 in pre-recorded U.S. currency to OROZCO. He counted the money and then handed it to "Bubba." UC1 asked "Bubba" if he lived in the apartment. "Bubba" replied in the affirmative. "Bubba" then handed UC1 a black backpack to conceal the firearms. OROZCO asked the UC's if they were interested in grenade launchers and said that the individual has about four grenades for it. At about 3:17 p.m., the UC's left the location.

58.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as: one Glock .45-caliber machinegun pistol, model 30, with an obliterated serial number; one Glock .45-caliber machinegun pistol, model 21, bearing serial

18

advised UC1 to contact him when he arrived at this location. At about 2:54 p.m., UC1 sent a text message to the (209) 420-4511 and said that he was near the Raley's at the intersection of East Morada Lane and Highway 99. OROZCO asked UC1 to drive to the apartments directly across the street from the Raley's and said he would let UC1 into the gated complex.

56.     The UC's traveled across the street to the Palms at Morada apartment complex located at 4030 E. Morada Lane. They saw OROZCO and an unidentified black man standing by a gate to the complex. OROZCO told the UC's to drive around to the first building to the left and said that they would see his orange Monte Carlo parked near building 2. The UC's parked near building 2 and greeted OROZCO and the unidentified subject at the base of a staircase. The UC's followed OROZCO and the unidentified subject into apartment #2206. Upon entering the apartment, the UC's saw six firearms displayed on the kitchen counter. The unidentified black man introduced himself to the UC's as "Bubba." OROZCO indicated that three of the Glock pistols had been converted to machineguns. As UC1 discussed the prices for the firearms, OROZCO advised that Michael BENNETT supplied the Glock machineguns. OROZCO further advised the UC's that the two additional Glock pistols belonged to OROZCO and that the revolver belonged to MAXIMILIANO SANCHEZ. OROZCO said that his cousin was leaving for Oregon on April 17 to acquire more firearms.

57.     At about 3:08 p.m., UC1 handed $7,800.00 in pre-recorded U.S. currency to OROZCO. He counted the money and then handed it to "Bubba." UC1 asked "Bubba" if he lived in the apartment. "Bubba" replied in the affirmative. "Bubba" then handed UC1 a black backpack to conceal the firearms. OROZCO asked the UC's if they were interested in grenade launchers and said that the individual has about four grenades for it. At about 3:17 p.m., the UC's left the location.

58.     Agents transported the firearms to the Stockton ATF Field Office for processing. They identified the firearms as: one Glock .45-caliber machinegun pistol, model 30, with an obliterated serial number; one Glock .45-caliber machinegun pistol, model 21, bearing serial

18

#AZL229 US; one Glock .40-caliber machinegun pistol, model 22 made from an unfinished receiver with no serial number; one Glock .40-caliber pistol, model 22, bearing serial #VCA062; one Glock 9mm pistol, model 19, bearing serial #ATK871 US; and one Ruger .44 magnum-caliber revolver, model Super Blackhawk, bearing serial #82-69192.

59.      An NCIC query revealed that the Ruger .44 magnum revolver bearing serial #82-69192 – and sourced from MAXIMILIANO SANCHEZ – is stolen firearm. OROZCO and the unidentified black man also provided the UC's with 18 rounds of .40-caliber ammunition.

60.      ATF's Firearms Technology Criminal Branch later examined the .45-caliber Glock machinegun pistol with no serial number. The branch report issued on April 27, 2018, confirms that a single function of this pistol's trigger automatically shoots more than one shot without manual reloading. Thus, the weapon is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). The report also finds that the pistol bears an obliterated serial number in violation of 26 U.S.C. § 5861 and 18 U.S.C. § 922(k). In addition, the report finds that the pistol contains a switch designed to convert a semiautomatic Glock pistol into a machinegun and that this switch, in and of itself, is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). The branch report further confirms that the switch does not bear any markings or identification as required by 26 U.S.C. § 5842.

61.      ATF's Firearms Technology Criminal Branch also later examined the .45-caliber Glock pistol with serial number AZL229 US. The branch report issued on April 27, 2018, confirms that a single function of this pistol's trigger automatically shoots more than one shot without manual reloading. Thus, the weapon is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). In addition, the report finds that the pistol contains a switch designed to convert a semiautomatic Glock pistol into a machinegun and that this switch, in and of itself, is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). The branch report further confirms that the switch does not bear any markings or identification as required by 26 U.S.C. § 5842.

19

62.     ATF's Firearms Technology Criminal Branch also later examined the .40-caliber Glock pistol made from an unfinished receiver. The branch report issued on April 27, 2018, confirms that a single function of this pistol's trigger automatically shoots more than one shot without manual reloading. Thus, the weapon is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). In addition, the report finds that the pistol contains a switch designed to convert a semiautomatic Glock pistol into a machinegun and that this switch, in and of itself, is a machinegun under 26 U.S.C. § 5845(b) and a firearm under 26 U.S.C. § 5845(a)(6). The branch report further confirms that the switch does not bear any markings or identification as required by 26 U.S.C. § 5842.

### May 3, 2018: Purchase of three firearms at 2906 Whittier Court

63.     On May 3, 2018, at about 1:45 p.m., UC1 arrived at 2906 Whittier Court, Stockton, California, to meet with OROZCO to conduct a firearm transaction. UC1 had communicated with OROZCO via cellular phone to arrange for this transaction.

64.     Upon arrival, UC1 observed OROZCO and an unidentified Hispanic man standing in the open garage of the residence. UC1 greeted OROZCO and the unidentified Hispanic male, who introduced himself as "Marcos." Upon entering the garage, OROZCO pointed to a shotgun on a box. He also retrieved a double-barrel shotgun from a separate location in the garage. OROZCO then walked over to a third shotgun and explained that he was attempting to tighten the stock.

65.     OROZCO asked UC1 if he remembered "Michael," which UC1 took as a reference to Michael BENNETT. OROZCO said that Michael had an AR-15 that UC1 had agreed to purchase but that Michael was at work. OROZCO then described the firearm and showed UC1 a picture of it on his phone. UC1 asked OROZCO if Marcos was the cousin who traveled to Oregon, and OROZCO replied, "No." UC1 then inspected the double-barreled shotgun and asked OROZCO if he just cut off the barrel. OROZCO responded in the

affirmative. UC1 then saw the sawed off double barrel on the ground in a box next to a cut off tool.

66.     UC1 asked OROZCO if the firearms dealer in Oregon would sell UC1 firearms without paperwork. OROZCO said that the firearms dealer probably would if UC1 met up with OROZCO in Oregon at the same time. OROZCO explained that the dealer has about three people who remove firearms from the same truck during shipments.

67.     OROZCO said that his cousin has one of the shotguns – a Keltec KSG – that UC1 had discussed on a previous deal. OROZCO said that his cousin would report it stolen for the right price.

68.     OROZCO asked whether UC1 had fired the gray machinegun Glock pistol. UC1 advised that he had fired that machinegun and that he had sold a couple of the other machineguns for a profit. OROZCO advised UC1 that, after he gets a firearm, he sells it quickly. OROZCO also said that he puts the firearm in someone else's car and follows the second person because OROZCO is on probation.

69.     At about 2:01 p.m., UC1 handed OROZCO $1,800.00 in pre-recorded U.S. currency to complete the transaction. UC1 left the location at about 2:04 p.m.

70.     Agents transported the firearms to the Stockton ATF Field Office. They identified the firearms as one Savage short-barreled, 12-gauge shotgun, model 311, bearing serial #B409389; one Winchester short-barreled, 12-gauge shotgun, model 140 Ranger, bearing serial #N1075150; and one Mossberg 12-gauge shotgun, model 500 ATP8, bearing serial #H386124.

71.     The Savage and Winchester short-barreled shotguns have not yet been sent to ATF's Firearms Technology Criminal Branch for analysis.

## Federal Firearms Licenses

72.     In April 2018, an agent reviewed an ATF database for federal firearms licensees. The database indicated that none of the following people held or had ever applied for a federal

firearms license: OROZCO and BENNETT.

## Interstate Commerce

73.    ATF special agents researched the following firearms and determined that they had been manufactured outside of California:

| Date Sold | Serial # | Make | Model | Other |
|-----------|----------|------|-------|-------|
| 01/11/18 | XS511646 | Springfield Armory | XDS | .45-caliber pistol |
| 01/11/18 | 334-24052 | Ruger | SR9C | 9mm pistol |
| 01/24/18 | Obliterated | Ruger | AR-556 | 5.56-caliber rifle |
| 02/21/18 | 910845 | Stoeger | P350 | 12-gauge shotgun |
| 02/27/18 | TF11196 | Smith & Wesson | M&P 15 | .223/5.56-caliber rifle |
| 02/27/18 | H108692 | Westernfield | M550 ABD | 12-gauge shotgun |
| 03/15/18 | DDM4059879 | Daniel Defense | M4 | 5.56-caliber rifle |
| 03/15/18 | 20C074691 | Sig Sauer | SIG M400 | 5.56-caliber rifle |
| 03/28/18 | DNWC037202 | DPMS Inc. | A15 | multi-caliber rifle |
| 04/16/18 | VCA062 | Glock | 22 | .40-caliber pistol |
| 04/16/18 | ATK871 US | Glock | 19 | 9mm pistol |
| 04/16/18 | 82-69192 | Ruger | Super Blackhawk | .44 magnum-caliber revolver |
| 05/03/18 | H386124 | Mossberg | 500 ATP8 | 12-gauge shotgun |

## TRAINING AND EXPERIENCE REGARDING
## GUN TRAFFICKING AND GUN TRAFFICKERS

74.    I know from my training, experience, and discussions with other experience law enforcement officials that firearms traffickers and their co-conspirators frequently possess the following evidence of their unlawful activity in their residences, shops, storage units, vehicles, and on their persons:

a)  United States and foreign currency linked to firearm trafficking or the proceeds of firearm trafficking;

b)  Money ledgers, firearm distribution or customer lists, firearm supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from firearm distribution and the transfer, investment, control and disposition of those proceeds;

c)  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of firearms;

d)  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to trafficking in firearms;

e)  Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and

23

illegal activities of associates in firearm trafficking activities;

f) Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers, and any cases, bags or boxes used to carry firearms;

g) Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of illegal firearms;

h) Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

i) Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to firearm trafficking or discovered in the possession of a prohibited person;

j) Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

k) Personal property tending to show the existence and/or location of other stored firearms including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

l) Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

m) Illegally obtained firearms, firearm parts, pieces, and scraps, including incomplete

24

firearms receivers commonly referred to as "80% receivers," filings, shavings, tools and/or equipment associated with the manufacture of machine guns and other firearms including, but not limited to drills, drill presses, lathes, milling machines, CNC machines, welding equipment, hack saws, power saws, and templates, diagrams, instruction, manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

75.    I know from my training and experience and discussions with experience law enforcement officers that firearm owners store the firearms in safes, gun safes, locked cabinets, and/or other secured containers. I also know that individuals that possess firearms typically store their firearms in their homes. They store their firearms in their homes for a number of reasons, including to safely and securely store the firearm, for quick access to the firearm for personal and property protection, and for convenient access for use of firearms for sporting purposes. I know from my training and experience that firearm owners also often store firearms in their vehicles or on their persons.

76.    I know that firearm traffickers and their co-conspirators generally use cellular telephones to communicate with one another by voice and text message. Cellular telephones are digital devices that preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other firearm traffickers and their co-conspirators and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Cellular telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by firearm traffickers and their co-conspirators is evidence of the associations of the firearm traffickers and their co-conspirators, some of which are related to his or her illegal business. Cellular telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a firearm trafficker's and/or manufacturer's mobile telephone can contain evidence of firearm trafficking

25

because it shows the communications or planned communications of a firearm trafficker and/or manufacturer and the telephone numbers of those with whom the firearm trafficker and/or manufacturer communicated or intended to communicate. Cellular telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Firearms traffickers and their co-conspirators sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Cellular telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by firearm traffickers and their co-conspirators. Cellular telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a firearms trafficker who took pictures of evidence of crime. Cellular telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

77.     It has been my experience in the past, and particularly in this case, that when suspects utilize cellular telephones to communicate with cooperating individuals or undercover agents to set up the purchase of guns, records relating to these activities will be found stored in the cellular telephone. In the course of this investigation, firearm trafficker Christian OROZCO has used cellular phones to communicate about his ongoing firearms trafficking. Based on my training and experience, I believe that MAXIMILIANO SANCHEZ, MICHAEL SANCHEZ, and Michael BENNETT have likely communicated via text messaging and/or voice call with each other and/or other potential buyers of firearms.

78.     In my experience, firearm traffickers and their co-conspirators may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

79.     Repeated firearm trafficking activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and

documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearm traffickers and their co-conspirators to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

80.     As a result of my experience and training, I have learned that firearm traffickers and their co-conspirators maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in digital storage devices. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. Through my training and experience, I know that the business of firearms trafficking is similar to drug trafficking, and by analogy to the case of drug dealers, evidence is likely to be found where the dealers live. *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. *See United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).

81.     Based upon my training and experience, the above-described documentary evidence can be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives, etc.). Although the above-described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicles, in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm trafficker's and/or manufacturer's person to secure this evidence.

27

82.    I know, based on my training and experience, that the number of firearm
traffickers and their co-conspirators using computers and electronic information storage devices,
like the general population as a whole, is steadily increasing, and such computer hardware,
software, documentation, passwords, and electronic information storage devices may be
instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic
information storage devices offer firearm traffickers and their co-conspirators and distributors
convenient devices for recording information concerning firearms, including sources, co-
conspirators and customers, records of purchases and sales, and any other information deemed
pertinent by the firearm traffickers and their co-conspirators and distributor. Much of the
electronic media storage devices, such as floppy disks, zip disks, thumb drives, CD-ROMs, SD
memory cards, are very small, detachable, portable, and can be secreted in small containers, such
as safes and clothing pockets. I also know, based on my training and experience, that firearm
traffickers and their co-conspirators often communicate with their criminal associates and with
potential buyers through the use of electronic mail, instant messaging, text messaging, telephone
answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearm
traffickers and their co-conspirators, these communication devices are part of their normal
business equipment.

83.    As described above, this Affidavit seeks permission to search and seize things that
are related to the crimes alleged in the complaint in whatever form such things are stored.
Accordingly, based on the investigation in this case and my training and experience, I believe
that items listed in Attachment B will be found on the persons and in the locations listed in
Attachments A-1 through A-4.

## SUMMARY OF EVIDENCE RELATED TO SEARCH LOCATIONS

84.    The residence located at 8755 Deer Creek Circle, Stockton, California and
described in more detail in Attachment A-1:

28

a)      Site of firearms transactions on January 11, 2018; February 2, 2018;

February 7, 2018; February 21, 2018; February 27, 2018; March 7, 2018; and

March 15, 2018;

b)      Home of Christian OROZCO until at least March 15, 2018;

c)      Home of MAXIMILIANO SANCHEZ and MICHAEL SANCHEZ at

least until March 15, 2018.

85.      The residence located at 973 Green Ridge Drive, Stockton, California and
described in more detail in Attachment A-2:

a)      Site of a firearms transaction on March 28, 2018; and

b)      Home of Christian OROZCO as of March 28, 2018.

86.      The apartment located at 4030 E. Morada Lane #2206, Stockton, California and
described in more detail in Attachment A-3:

a)      Site of firearms transaction on April 16, 2018; and

b)      Home of unidentified co-conspirator "Bubba."

87.      The Chevrolet Monte Carlo driven by Christian Orozco and described in more
detail in Attachment A-4:

a)      UC3 saw OROZCO retrieve an AR-15-style rifle from the interior of an

orange Chevrolet Monte Carlo on March 7, 2018; and

b)      OROZCO told the UC's that it was his car on April 16, 2018; and

c)      Parked outside the East Morada Lane apartment during the firearms

transaction on April 16, 2018.

## CONCLUSION

88.      This Affidavit describes probable cause to believe that Christian OROZCO,
MAXIMILIANO SANCHEZ, MICHAEL SANCHEZ, and Michael BENNETT have committed
firearms crimes. Therefore, I request that a Criminal Complaint and arrest warrants be issued

and charge the defendants with the crimes listed in Paragraph 4.

89.     In this case, the facts set forth in this Affidavit demonstrate probable cause to believe that the locations listed in **Attachments A-1** through **A-4** contain evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing the crimes listed in Paragraph 4.

//

//

//

//

//

//

//

## **REQUEST TO SEAL**

90.     At this time, disclosure of this Affidavit or its contents could seriously impede our investigation and potential prosecution. For example, disclosure might cause investigation subjects to flee, to destroy evidence, or to intimidate potential witnesses. Accordingly, I respectfully request that the Court issue an order sealing this Affidavit and its associated Complaint, Arrest Warrants, and Search Warrants until further order of this Court. I also request exceptions that allow law enforcement agents to execute the searches, to leave copies of the search warrants at each search location, and to assist them in their continuing investigation.


I declare under penalties of perjury that the statements above are true and accurate to the best of my knowledge and belief.


Special Agent Austin Kern
Bureau of Alcohol, Tobacco, Firearms and
Explosives


Sworn to and subscribed before
me on the ___5___ day of May, 2018


ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE


Approved as to form:


Amanda Beck
Assistant U.S. Attorney

31

## ATTACHMENT A-1

### 8755 Deer Creek Circle

The subject premises is located at 8755 Deer Creek Circle, Stockton, California, 95210. It is a two-story, brown house with green, wood-panel trim. The house has a two-car garage with stone accent on both sides. The numbers "8755" are black in color and located above the garage door on the right side. Above the garage, there are two large windows on the second story of the residence. The front door of the residence is brown in color and located to the right of the garage. The front door is also secured with a metal security screen.



## ATTACHMENT A-2

### 973 Green Ridge Drive

The subject premises is located at 973 Green Ridge Drive, Stockton, California, 95209. It is a two-story, white, stucco house with tan trim. The house has a two-car garage that is located to the right of the front door. There is a single window located above the garage door. The numbers "973" are black in color and located on the right side of the house, above the garage. The front door of the residence is located to the left of the garage and is secured with a white metal security screen.



## ATTACHMENT A-3

## 4030 East Morada Lane #2206

The subject premises is a two-bedroom apartment located at 4030 East Morada Lane, #2206, Stockton, California, 95212. This apartment is located in a complex of buildings that are tan with brown trim. The apartment is located in building "2," which faces Highway 99 from the east side of the complex. Apartment #2206 is located on the second floor of building "2." The front door of the apartment is brown. The numbers "2206" are black and located to the right of the front door.



## ATTACHMENT A-4

### Monte Carlo

The orange Chevrolet Monte Carlo previously driven by Christian Orozco and photographed below.





## Attachment B-1
## Items to Be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Christian OROZCO, MICHAEL SANCHEZ, MAXIMILIANO SANCHEZ, and Michael BENNETT:

> 18 U.S.C. § 371 – Conspiracy to commit a federal crime – dealing firearms without a license, a violation of 18 U.S.C. § 922(a)(1)(A) – between about January 11, 2018, and the present

> 18 U.S.C. § 922(a)(1)(A) – Dealing firearms without a license between about January 11, 2018, and the present

> 26 U.S.C. § 5861(d) – Unlawful possession of an unregistered firearm on February 2, 2018; February 7, 2018; February 27, 2018; March 7, 2018; March 15, 2018; March 28, 2018; and April 16, 2018.

> 18 U.S.C. § 922(g)(1) – Unlawful possession of a firearm by a prohibited person on January 11, 2018; January 24, 2018; February 21, 2018; March 15, 2018; March 28, 2018; April 16, 2018; and May 3, 2018.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. United States and foreign currency linked to firearm trafficking or the proceeds of firearm trafficking, including the prerecorded government money provided to OROZCO during the controlled purchases made on the dates listed above;

2. Money ledgers, firearm distribution or customer lists, firearm supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from firearm distribution and the transfer, investment, control and disposition of those proceeds;

3. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of firearms;

1

4.  Computers, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute and/or traffic in firearms;

5.  Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in firearm trafficking activities;

6.  Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry such items;

7.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of firearms;

8.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, rental car receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

9.  Handguns, shotguns, rifles, ammunition and other firearms possessed in relation firearm trafficking or discovered in the possession of a prohibited person;

10. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

11. Personal property tending to show the existence and/or location of other stored firearms including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

12. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

13. Illegally obtained firearms, firearm parts, pieces, and scraps, including incomplete firearms receivers commonly referred to as "80% receivers." Filings, shavings, tools and/or equipment associated with the manufacture of machine guns and other firearms including, but not limited to drills, drill presses, lathes, milling machines, CNC machines,

welding equipment, hack saws, power saws, and templates, diagrams, instruction, manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

14. As it relates to firearm trafficking: All names, words, telephone numbers, time / date information, text messages in the memory of the mobile telephone or on a server and associated with the mobile telephone used any of the defendants discovered during execution and described as the mobile telephones, as it relates to the defendants' illegal firearm trafficking: ·

      a.    Incoming call history;

      b.    Outgoing call history;

      c.    Missed call history;

      d.    Outgoing text messages;

      e.    Incoming text messages;

      f.    Draft text messages;

      g.    Telephone book;

      h.    Data screen or file identifying the telephone number associated with the mobile telephone searched;

      i.    Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched.

15. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A-1 without revealing the officer's true identities.

16. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B; and

17. Digital evidence of items described in Attachment B.

**Attachment B-2**
**Items to Be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Christian OROZCO, MICHAEL SANCHEZ, MAXIMILIANO SANCHEZ, and Michael BENNETT:

> 18 U.S.C. § 371 – Conspiracy to commit a federal crime – dealing firearms without a license, a violation of 18 U.S.C. § 922(a)(1)(A) – between about January 11, 2018, and the present
>
> 18 U.S.C. § 922(a)(1)(A) – Dealing firearms without a license between about January 11, 2018, and the present
>
> 26 U.S.C. § 5861(d) – Unlawful possession of an unregistered firearm on February 2, 2018; February 7, 2018; February 27, 2018; March 7, 2018; March 15, 2018; March 28, 2018; and April 16, 2018.
>
> 18 U.S.C. § 922(g)(1) – Unlawful possession of a firearm by a prohibited person on January 11, 2018; January 24, 2018; February 21, 2018; March 15, 2018; March 28, 2018; April 16, 2018; and May 3, 2018.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. United States and foreign currency linked to firearm trafficking or the proceeds of firearm trafficking, including the prerecorded government money provided to OROZCO during the controlled purchases made on the dates listed above;

2. Money ledgers, firearm distribution or customer lists, firearm supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from firearm distribution and the transfer, investment, control and disposition of those proceeds;

3. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of firearms;

4. Computers, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute and/or traffic in firearms;

5. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in firearm trafficking activities;

6. Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry such items;

7. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of firearms;

8. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, rental car receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

9. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation firearm trafficking or discovered in the possession of a prohibited person;

10. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

11. Personal property tending to show the existence and/or location of other stored firearms including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

12. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

13. Illegally obtained firearms, firearm parts, pieces, and scraps, including incomplete firearms receivers commonly referred to as "80% receivers." Filings, shavings, tools and/or equipment associated with the manufacture of machine guns and other firearms including, but not limited to drills, drill presses, lathes, milling machines, CNC machines,

welding equipment, hack saws, power saws, and templates, diagrams, instruction, manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

14. As it relates to firearm trafficking: All names, words, telephone numbers, time / date information, text messages in the memory of the mobile telephone or on a server and associated with the mobile telephone used any of the defendants discovered during execution and described as the mobile telephones, as it relates to the defendants' illegal firearm trafficking:

    a.    Incoming call history;

    b.    Outgoing call history;

    c.    Missed call history;

    d.    Outgoing text messages;

    e.    Incoming text messages;

    f.    Draft text messages;

    g.    Telephone book;

    h.    Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i.    Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched.

15. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A-1 without revealing the officer's true identities.

16. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B; and

17. Digital evidence of items described in Attachment B.

## Attachment B-3
## Items to Be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Christian OROZCO, MICHAEL SANCHEZ, MAXIMILIANO SANCHEZ, and Michael BENNETT:

18 U.S.C. § 371 – Conspiracy to commit a federal crime – dealing firearms without a license, a violation of 18 U.S.C. § 922(a)(1)(A) – between about January 11, 2018, and the present

18 U.S.C. § 922(a)(1)(A) – Dealing firearms without a license between about January 11, 2018, and the present

26 U.S.C. § 5861(d) – Unlawful possession of an unregistered firearm on February 2, 2018; February 7, 2018; February 27, 2018; March 7, 2018; March 15, 2018; March 28, 2018; and April 16, 2018.

18 U.S.C. § 922(g)(1) – Unlawful possession of a firearm by a prohibited person on January 11, 2018; January 24, 2018; February 21, 2018; March 15, 2018; March 28, 2018; April 16, 2018; and May 3, 2018.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. United States and foreign currency linked to firearm trafficking or the proceeds of firearm trafficking, including the prerecorded government money provided to OROZCO during the controlled purchases made on the dates listed above;

2. Money ledgers, firearm distribution or customer lists, firearm supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from firearm distribution and the transfer, investment, control and disposition of those proceeds;

3. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of firearms;

4. Computers, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute and/or traffic in firearms;

5. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in firearm trafficking activities;

6. Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry such items;

7. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of firearms;

8. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, rental car receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

9. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation firearm trafficking or discovered in the possession of a prohibited person;

10. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

11. Personal property tending to show the existence and/or location of other stored firearms including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

12. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

13. Illegally obtained firearms, firearm parts, pieces, and scraps, including incomplete firearms receivers commonly referred to as "80% receivers." Filings, shavings, tools and/or equipment associated with the manufacture of machine guns and other firearms including, but not limited to drills, drill presses, lathes, milling machines, CNC machines,

2

welding equipment, hack saws, power saws, and templates, diagrams, instruction, manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

14. As it relates to firearm trafficking: All names, words, telephone numbers, time / date information, text messages in the memory of the mobile telephone or on a server and associated with the mobile telephone used any of the defendants discovered during execution and described as the mobile telephones, as it relates to the defendants' illegal firearm trafficking:

    a.   Incoming call history;
    b.   Outgoing call history;
    c.   Missed call history;
    d.   Outgoing text messages;
    e.   Incoming text messages;
    f.   Draft text messages;
    g.   Telephone book;
    h.   Data screen or file identifying the telephone number associated with the mobile telephone searched;
    i.   Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched.

15. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A-1 without revealing the officer's true identities.

16. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B; and

17. Digital evidence of items described in Attachment B.

**Attachment B-4**
**Items to Be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Christian OROZCO, MICHAEL SANCHEZ, MAXIMILIANO SANCHEZ, and Michael BENNETT:

> 18 U.S.C. § 371 – Conspiracy to commit a federal crime – dealing firearms without a license, a violation of 18 U.S.C. § 922(a)(1)(A) – between about January 11, 2018, and the present

> 18 U.S.C. § 922(a)(1)(A) – Dealing firearms without a license between about January 11, 2018, and the present

> 26 U.S.C. § 5861(d) – Unlawful possession of an unregistered firearm on February 2, 2018; February 7, 2018; February 27, 2018; March 7, 2018; March 15, 2018; March 28, 2018; and April 16, 2018.

> 18 U.S.C. § 922(g)(1) – Unlawful possession of a firearm by a prohibited person on January 11, 2018; January 24, 2018; February 21, 2018; March 15, 2018; March 28, 2018; April 16, 2018; and May 3, 2018.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. United States and foreign currency linked to firearm trafficking or the proceeds of firearm trafficking, including the prerecorded government money provided to OROZCO during the controlled purchases made on the dates listed above;

2. Money ledgers, firearm distribution or customer lists, firearm supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from firearm distribution and the transfer, investment, control and disposition of those proceeds;

3. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of firearms;

4. Computers, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute and/or traffic in firearms;

5. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in firearm trafficking activities;

6. Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry such items;

7. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of firearms;

8. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, rental car receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

9. Handguns, shotguns, rifles, ammunition and other firearms possessed in relation firearm trafficking or discovered in the possession of a prohibited person;

10. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

11. Personal property tending to show the existence and/or location of other stored firearms including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

12. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

13. Illegally obtained firearms, firearm parts, pieces, and scraps, including incomplete firearms receivers commonly referred to as "80% receivers." Filings, shavings, tools and/or equipment associated with the manufacture of machine guns and other firearms including, but not limited to drills, drill presses, lathes, milling machines, CNC machines,

welding equipment, hack saws, power saws, and templates, diagrams, instruction, manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

14. As it relates to firearm trafficking: All names, words, telephone numbers, time / date information, text messages in the memory of the mobile telephone or on a server and associated with the mobile telephone used any of the defendants discovered during execution and described as the mobile telephones, as it relates to the defendants' illegal firearm trafficking:

    a.    Incoming call history;

    b.    Outgoing call history;

    c.    Missed call history;

    d.    Outgoing text messages;

    e.    Incoming text messages;

    f.    Draft text messages;

    g.    Telephone book;

    h.    Data screen or file identifying the telephone number associated with the mobile telephone searched;

    i.    Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched.

15. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A-1 without revealing the officer's true identities.

16. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B; and

17. Digital evidence of items described in Attachment B.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of

973 Green Ridge Drive,
Stockton, California, 95209

)
)
)
)
)

Case No.  2:18-SW 422 AC

SEALED

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached and incorporated by reference.**

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B-2, attached and incorporated by reference.**

        **YOU ARE COMMANDED** to execute this warrant on or before ____5/22/18____ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
        ☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:  ____5/8/18  4:10pm____          _____
                                                                                                *Judge's signature*

City and state:     Sacramento, California _____          Allison Claire, U.S. Magistrate Judge
                                                                                          *Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____      _____
Signature of Judge                                              Date

**ATTACHMENT A-2**

**973 Green Ridge Drive**

The subject premises is located at 973 Green Ridge Drive, Stockton, California, 95209. It is a two-story, white, stucco house with tan trim. The house has a two-car garage that is located to the right of the front door. There is a single window located above the garage door. The numbers "973" are black in color and located on the right side of the house, above the garage. The front door of the residence is located to the left of the garage and is secured with a white metal security screen.



## Attachment B-2
## Items to Be Seized

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Christian OROZCO, MICHAEL SANCHEZ, MAXIMILIANO SANCHEZ, and Michael BENNETT:

> 18 U.S.C. § 371 – Conspiracy to commit a federal crime – dealing firearms without a license, a violation of 18 U.S.C. § 922(a)(1)(A) – between about January 11, 2018, and the present

> 18 U.S.C. § 922(a)(1)(A) – Dealing firearms without a license between about January 11, 2018, and the present

> 26 U.S.C. § 5861(d) – Unlawful possession of an unregistered firearm on February 2, 2018; February 7, 2018; February 27, 2018; March 7, 2018; March 15, 2018; March 28, 2018; and April 16, 2018.

> 18 U.S.C. § 922(g)(1) – Unlawful possession of a firearm by a prohibited person on January 11, 2018; January 24, 2018; February 21, 2018; March 15, 2018; March 28, 2018; April 16, 2018; and May 3, 2018.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. United States and foreign currency linked to firearm trafficking or the proceeds of firearm trafficking, including the prerecorded government money provided to OROZCO during the controlled purchases made on the dates listed above;

2. Money ledgers, firearm distribution or customer lists, firearm supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from firearm distribution and the transfer, investment, control and disposition of those proceeds;

3. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of firearms;

4.  Computers, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute and/or traffic in firearms;

5.  Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in firearm trafficking activities;

6.  Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry such items;

7.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of firearms;

8.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, rental car receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

9.  Handguns, shotguns, rifles, ammunition and other firearms possessed in relation firearm trafficking or discovered in the possession of a prohibited person;

10. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

11. Personal property tending to show the existence and/or location of other stored firearms including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

12. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

13. Illegally obtained firearms, firearm parts, pieces, and scraps, including incomplete firearms receivers commonly referred to as "80% receivers." Filings, shavings, tools and/or equipment associated with the manufacture of machine guns and other firearms including, but not limited to drills, drill presses, lathes, milling machines, CNC machines,

welding equipment, hack saws, power saws, and templates, diagrams, instruction, manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

14. As it relates to firearm trafficking: All names, words, telephone numbers, time / date information, text messages in the memory of the mobile telephone or on a server and associated with the mobile telephone used any of the defendants discovered during execution and described as the mobile telephones, as it relates to the defendants' illegal firearm trafficking:

     a.    Incoming call history;
     b.    Outgoing call history;
     c.    Missed call history;
     d.    Outgoing text messages;
     e.    Incoming text messages;
     f.    Draft text messages;
     g.    Telephone book;
     h.    Data screen or file identifying the telephone number associated with the mobile telephone searched;
     i.    Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched.

15. Permission to answer, record, monitor, note, and converse with callers who appear to be calling in regards to firearms trafficking on any telephone or cellular phone within the locations set forth in Attachment A-1 without revealing the officer's true identities.

16. Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B; and

17. Digital evidence of items described in Attachment B.